Case No. 16-1191 at Elm, Bellagio, LLC Doing Business, Bellagio, Las Vegas Petitioner v. National Labor Relations Board Mr. Trimmer for the petitioners, Mr. Casterly for the respondents Good morning, Mr. Trimmer. Good morning. I'm Paul Trimmer of Jackson-Lewis for the petitioners, and may it please the Court. This case presents three different issues, but I'd like to focus on the two issues of statutory and regulatory interpretation. What's the third one? The confidential employee status. The first, the regulatory interpretation issue, is the Labor Board's conclusion that Section 102.61a8 allows it to exercise discretion and excuse noncompliance even though the Labor Board has essentially conceded that its interpretation of the regulation is contrary to the rules text and its plain meaning. It's our position that that's arbitrary and capricious and contrary to other Board decisions interpreting mandatory language. What's the harm you suffer from this? Other than the harm inherent in one side not having to play by the rules none. Well, you're informed at the hearing of what the answer would have been, right? That's correct. So you know what you were deprived of knowing earlier you knew from the outset of the hearing. That's correct. We don't deny that. We haven't argued that we were prejudiced in any significant way. The issue from our perspective is that it's an arbitrary and capricious approach to interpretation of the rules. The rules are worded in a mandatory way, shall mean shall. And I believe our argument has gotten much stronger as the Board has issued a number of recent decisions interpreting the mandatory provisions in its regulations. The first is the case that was cited in our reply brief that was issued in December of 2016, URS Federal Services, where the Board explained that if the regulation doesn't contain express language vesting either the regional director or the Board with discretion to modify or choose not to enforce the rules, then the rules have to be enforced as written. And it would be our position that the rules should be interpreted the same way. Shall should be interpreted the same way in each one of its provisions. The Board... Well, since you're not harmed, I guess all you get out of that is delay, right? Is it delay? Delay, yeah. If you prevail on that point, all you get is delay because then they file the paper that's filled out. That's correct. And, of course, shall and may, there's a lot of history and cases on when a shall is a may and vice versa. Years ago we said you don't just tally up the shalls and mays and decide which one prevails. But this is a matter of the agency managing its docket, isn't it? Well, I don't... It's something where we really don't interfere with their business unless they've done something egregious. I think that that's generally correct. Our concern is that, especially in the recent decision, URS, where the Labor Board stood on a soapbox beating the table saying shall be shall. That's a substantive decision. It is. It's interpreting. It doesn't help you then. Pardon me? It doesn't really help you in terms of Labor Board precedent. You take it as of the time that they ruled against you. Well, it does help in the sense that it shows that parallel provisions with similar language should be interpreted in the same way. And you can't reconcile... Is that case dead or does it still on appeal? That case has not been appealed as far as I know, but it wouldn't necessarily be appealed. That might be the inconsistent case. Pardon me? That might be the inconsistent case. Well, I don't think so because there are other cases cited in the 28J letter, Williams and Sonoma, where the board applied its rules as a bright line rule. There's another involving Aramark, which is 364 NLRB. Were they on this provision, on the 261? They're not on that provision, but there's no meaningful way to distinguish those cases in the analysis. So is that true of any provision that uses shall? Is there any argument that any time the board has a provision that uses the term shall, that then the failure to abide by that condition means that the representation election would have to be invalidated? According to the board's reasoning in URS, I think the answer is yes. The board's decision in URS said that in the absence of an express discretionary provision, the rules have to be enforced as written. Clearly, the board could have chosen to write its regulations in a different way. It could have vested the regional director with a general discretionary authority to excuse noncompliance with the rules. The other part of this is, although we didn't suffer any prejudice, the union, when it petitioned, would have suffered no prejudice just by refiling its petition and completing the petition accurately. That wouldn't have led to any significant delay. Which just shows that this is a trivial dispute over this issue. We don't agree that it's trivial. You really don't solve the problem in a trice, and the employer doesn't suffer any harm whether they do or don't. Well, again, I would agree with that in the sense that that's the normal way to fix technical problems. The problem in this case is that the LRB has arbitrarily enforced technical compliance in some situations and excused it in noncompliance in others. The URS case, the Aramark case, and the Williams and Sonoma case all involved situations where there was no prejudice whatsoever, yet the board required compliance with the Bright Line provision and invalidated an election, for example, in the URS. In the URS, the employer had won the election 91 to 58. There was no prejudice alleged. The union claimed no harm by the failure to receive a voter list on time, yet the board said the language in the regulation is mandatory and must be enforced as written. The same situation was in Aramark, where a union failed to include an offer of proof with its objections. So would that apply to the provision that says in the same regulation that the petition shall contain the address of the establishments involved? So if it fails to include one of the addresses, that means you undo the representation election. It would mean that the petition should be dismissed. It wouldn't be undoing the election. This should have been fixed at the regional director level. And I would add, although it's not in the record, that is how it's been applied, at least in our region, because I just litigated a case involving a similar issue where the union had named the wrong employer and the wrong address and the regional director. It was a case involving MGM Resorts and Circus Circus, and the regional director dismissed the petition. So it is a situation where the language – the board – Excuse me. In that case, at what stage did the RD dismiss it? At the initial stage. Oh, so the – After a hearing. After a hearing. Yes. And I would add, you know, the union did not amend the petition. It could have cured the petition with an amendment at the hearing. It requested recognition – Can you go on to your second argument about the guard? Yes. Thank you. So guard status is set forth in the Act in Section 9B.3, and it's our position that the statutory text covers anyone employed for the purpose of enforcing, against employers and others, rules to protect property or to protect the safety of people on company property. Are the surveillance operators in any bargaining unit? Surveillance operators? Right. No. The surveillance operators are not organized at any property in Las Vegas. Surveillance technicians are organized at some casinos in Las Vegas, but surveillance operators – that phrase refers to the individuals who monitor the screens. They are not currently organized at any casino in Las Vegas. They have been petitioned for by the SPFPA, one of the guard unions, not recently but about five or six years ago. So they're clearly considered to be guards. The MGM case that's cited in our brief involved a situation where the SPFPA sought to – or the International Union of Operating Engineers sought to organize operators, and the board dismissed that petition because they were guards. In that context, the fact that this is a modern Las Vegas hotel casino is what makes the board's decision in this case unsupportable. It used to be, when Bugsy Siegel ran the strip, that surveillance operators walked catwalks above the gaming floor and used binoculars to observe. That's not the case anymore, and, in fact, that wouldn't comply with Nevada law. That's a point set forth in our brief. Nevada law requires modern hotel casinos to maintain very sophisticated surveillance operations. The casino is really like a bank, isn't it? In other words, when you walk into a bank, you know that eyes are on you, but you also know that the surveillance cameras are the fail-safe. They're going to catch what human eyes can't catch or whatever. That is exactly right. The operators monitor and watch the cameras, but the technicians are essential. If they're not guards of the first rank, they're guards of the second rank, it seems to me, and particularly in the case of when they aim these cameras. They're the ones who aim the cameras at targeted either employees or patrons. That's correct. That brings up the potential or the danger of the divided loyalty principle that keeps guards from being unionized to begin with. That is exactly correct, and one of the things that we think distinguishes our case and our facts from the other installation and maintenance cases cited in the board's brief is the fact that the computer system used at the Mirage and at Bellagio, it's called the Honeywell system. These surveillance technicians tend to that system like a gardener would tend to a garden. It doesn't require periodic installation and on-call maintenance. It requires constant watering, constant tending to every day where they go in and ensure access credentials are appropriately employed. Are you talking about the tech students? The tech students. So we would contend that in ensuring that this living and breathing surveillance system survives and operates on a continuous basis, they are enforcing the rules of the employer. They're certainly enforcing rules with respect to access. Well, they're also enforcing the rules of the Gaming Commission. That's exactly right. And don't the Gaming Commission rules, aren't some of them directed specifically to the technicians? They are. And it would be our contention that, and this is set forth in our brief, that they are gaming employees and they would be treated as security personnel under Nevada law because of their responsibility for handling associated security equipment, which is their surveillance system. You alluded to this earlier. There's nothing more important in a casino than the gaming license, obviously. The gaming license in the casino can't operate without its surveillance system. It would be shut down. I'm a little confused on enforcement. I thought the question was whether there's enforcement of rules directed at other employees. Well, there are examples in the record of where surveillance technicians are intimately involved in the enforcement of rules against employees. First of all, they grant access to surveillance operators, security operators, because there are two different monitor rooms. And they also grant card key access. They control the issuance of electronic card keys to all the employees in the hotel casino. Right, so they might be essential to enabling enforcement by others, but they're not actually doing the enforcing. They're part of the physical sequence of events that leads to enforcement, that seems. Definitely true. That's certainly true. And then they also are actually enforcing the rules of access in the sense that they grant access or deny it. If the director of surveillance wishes to run a covert operation on a handful of dealers, on a blackjack pit, for example, the surveillance technicians are the only individuals who have the ability to turn off, access, or lock the camera. Operators can't do that. And in the record, the director, and this is in the book. So the access you're talking about is access to the cameras? Yes, it's the access to the system. For example, if you wanted to download a program to your computer here, you'd have to go through a very senior level IT official to get alpha admin access to your computer. These surveillance technicians have the same ability, or they have the same authority. And although the directors of each department have similar authority, they don't know how to exercise it. They can't actually employ it. Only the surveillance technicians have that authority. The board has, in its case law, consistently focused on, as we're discussing, enforcing rules. But their underlying concern with the conflict of interest arises only in respect to or during a labor dispute. So how is anything different for these people when there's a labor dispute or a conflict manifests? First, I think that the conflict of interest is broader than just a labor dispute. It's about- In the other cases, I don't see it. They do focus on divided loyalties when it comes to the enforcement of rules. In Laughlin Steel, the original guard cases talk about being able to count on a population when there's a strike. That's true.  They focus on divided loyalties when you have one bargaining unit enforcing rules against another bargaining unit. You can't have them represented by the same union because unions' internal rules discourage reporting co-workers for misconduct. They lead to a lot of tension in the relationship. So you're right that the cases, the beginning of the cases, talk about strikes. We believe it's been expanded. And that there are cases to that effect. Yes. Which, give me an example if you can. The Wells Fargo case. You're welcome to reply if you want to take the time. And the MGM Grant case certainly talk about enforcement of rules to protect property and to protect safety. Apart from the context of the labor dispute. Correct. And we believe that the wording of the statute permits our interpretation, that it would permit employees who are dedicated to protecting property or to protecting the safety of people on company property, and who would be subject to a conflict of interest. We believe that when that language is combined with the legislative history, Congress has spoken clearly. Is the MGM Grant, the one you were talking about, the 1985? It is. All right. And there were no surveillance technicians then. This was the fire and security alarm system. That's correct. The individuals in MGM Grant wore both hats. They were both the technician and the operator. Monitor, operator, and. Okay. So in the latter capacity, they were enforcing rules, not as technicians, but as monitors. That's correct. I do think it's important to remember, however, that the record contains examples of these surveillance technicians being actively involved in the enforcement of rules. And I think it's laid out very well. I think more specifically in the investigation of potential rule violations. That's true. But the problem is, because of the way bargaining works, if this unit were certified, the employer would be deprived of the ability to use surveillance technicians to place covert cameras unless it worked with a union, or unless it bargained with the union first. And one of the examples in our. . . I don't get that. I mean, it's one of the duties of the job. It is, but. . . To bargain over whether to do it. Well, but we wouldn't be able to use anybody else. That's the point. It's not as if these gentlemen are certified. We could just use security personnel to secretly install our cameras, or use operators to install secret cameras. We'd have to continue to use these individuals because it would be bargaining unit work. And that's where the conflict of interest arises. In our view, the natural evolution of the guard position on the strip requires both operators and surveillance technicians working hand-in-hand in order to satisfy Nevada regulatory requirements and ensure that the assets and patrons are protected. So if you thought you had a dirty dealer, you would go first to the technician. That's correct. And say, aim that camera at that table. That's correct. And so I say again, if the technician is not the first-line guard, he's assisting or the second-line guard, but he has the same danger of divided loyalty if he's in a bargaining unit with that dirty dealer as the operator would have who cannot be in that bargaining unit. That's correct. Because he's a guard. That's correct. In this particular case, who is in the existing bargaining unit? Pardon me? Who is in the union that's won the representation election? Yes. It's already the incumbent union with respect to some other employees, correct? Yes, facilities engineers. Facilities engineers. Yeah, so HVAC employees. Not anyone involved in security. That's right. The guards can be unionized, right? They just can't be in a mixed union. That's exactly right. This isn't denying them the right to have representation and vote for a union. It's just preventing them from selecting the operating engineers because, and this is an example from the record, there are situations where surveillance or security will have a surveillance technician place a lipstick camera up in a catwalk where they believe that facilities engineers are taking naps. There's clearly a conflict of interest, dual loyalties, when a member of the operating engineer's union is asked to place a secret camera in a place to observe one of the members of his union potentially engaging in misconduct. And this, what you said, is true regardless of whether they're different bargaining units? Yes, that's true. All right. Thank you. Thank you. Mr. Casserly? Good morning, and may it please the Court. I'm Dave Casserly representing the National Labor Relations Board. To find that an employee is a guard, the National Labor Relations Act requires that that employee must enforce work rules against others either to protect safety or property. Here, surveillance technicians install and maintain security cameras. They work mornings. They don't work all day. They only work during the times when they're least likely to be any other employees present. During those times, they repair and maintain these cameras. They're not responsible for reporting anything that they see. If they happen to be looking at footage to see if a camera's working, they're not responsible for reporting anything or trained to report anything any more than any other employee. Can you address the particular situation that was discussed earlier, which is a circumstance in which there's suspicions about certain employees and then the surveillance technicians are brought into play in order to train the cameras on those employees? Yes, Your Honor. First of all, the surveillance technicians at trial or at the hearing in this case testified that in those situations they didn't actually know who they were aiming the cameras at. They were told to set up cameras in a particular area. They didn't know that it was even part of an investigation. They're not privy to that information. Well, they know if it's aimed at a table, and they know if it's aimed at the catwalk that your colleague told us about. Yes, Your Honor. They would know where the cameras are aimed, but they're not asked just to change cameras for these types. They have to know why they're aiming. I mean, they're not aiming at the bottom of the table. They're aiming where the dealer's hands are moving or whatever. I mean, the fact that they don't know that it's one of 10 or 20 dealers, it still raises the danger. Why doesn't it raise the danger of the divided loyalty that is one of the main principles for keeping guards separate from the rest of the employees? Well, first of all, Your Honor, the question of divided loyalty is actually as to whether these guards would, say, refuse to cross a picket line or refuse to actually enforce a rule against another employee. Here, if the surveillance technicians say, no, I'm not going to aim that camera at that table, the employer can say you're not doing their job and do the same thing it would do to any other employee who doesn't do its job. Even if that's more likely in this situation, that's not the kind of thing that the act separated guards for. Separating guards was so that somebody who's going in there to actively cause damage to the employer's property is not going to be there. Somebody isn't going to refuse to stop them from doing so. It's hard to imagine a surveillance technician being in that situation where they're being asked ahead of time to place a camera, not asked at the actual time that infraction is happening to stop it or to prevent it from happening. So just taking that hypothetical another step, the surveillance technician says, okay, I'm putting the camera there and tips off the dealer, which they can do whether or not they're in the same union, I suppose. That doesn't add to more damage to the employer's property. It's not like they're refusing to report something that the dealer actually did. And to be clear— Wait a second. If they do tip off the subject, the target, then obviously the target doesn't go on violating it while on camera, right? Presumably, yes, Your Honor. But that's not the kind of violation that the act is concerned with. It's concerned with picket line crossing or stopping somebody from causing damage at the time. I thought the concern was conflict of interest. And what you just said is, of course, one manifestation of that, but it doesn't seem to be the only one. Yes, Your Honor, it's not the only one. But again, it's a concern with enforcing rules. And here, the surveillance section are not the people actually enforcing the rules. All they're doing is placing cameras. Somebody else has to look at that camera to enforce the rules. Somebody else has to determine that the infraction is happening. And even somebody else has to determine where the surveillance put the cameras. They have no authority to decide where to put the cameras on their own. I got a contrary impression from something in your friend's brief to the effect that the management might say, we want a camera placed on this freezer or refrigerator in the kitchen that wasn't there before. I mean, the camera wasn't there before. Clearly, they're investigating something. And then it's up to the tech to figure out a way and to do that to get the camera in place. I think they used an air duct in one instance. That's right, Your Honor. So the discretion is in how to, in some cases at least, instances, to how to capture the information that's being sought. That's correct, Your Honor. And it's pretty clear, then, who the target is or whose targets might be or where the offense is, potential offense. And if tipping off one's fellow union member is a concern, then here it is, conflict of interest. Yes, Your Honor. But what I'm saying is tipping off a fellow union member is not the concern contemplated by 9b-3. Well, we don't have cases on that. It's true. All the cases are as you described them. But why isn't the policy equally applicable here? Because the policy stems from workplace disputes where an employer is not going to be able to do its business at all because its guards say no. There's no rules that we're going to end up enforcing here. This kind of infraction. Wait a minute. The cases talk about preventing damage, for instance. If there was a strike, you know, somebody doing something harmful to the premises, right? It doesn't mean that it's preventing the employer from operating. Oh, maybe he's operating with a replacement. That's correct, Your Honor. It's just to prevent that harm. Right. It's about preventing that harm, but it's about asking the employees who are in there and faced immediately with that situation to not refuse at the time. Here, we're not reaching that situation just with an employee type tipping another employee off. That would be a very big expansion of the guards. So is what you're saying that it's not during the course of a labor dispute? Not during the course of a labor dispute or even during the actual infraction that's happening, the actual rule that is happening, that is not when the surveillance technician is asked to act. They're asked to act before that would possibly happen or after to place a camera. And the essential point is that that would expand, allowing anybody who could possibly tip off another employee, and there are no evidence in the record that this has ever happened. This is all speculation. Allowing anybody who could possibly tip off an employee about an investigation would be an immense broadening of the guard. You quoted this passage from an old case of ours, 1977. It's in your footnote 11 on 23. You said in the text that all of this is, in order, quote, to minimize the danger of divided loyalty that arises when a guard is called upon to enforce the rules of his employer against a fellow union member. Let me just change a few words. To minimize the danger of divided loyalty that arises when a guard is called upon to help spy on a fellow union member. That does change a few. That's what we're dealing with here, really. Well, it's to help somebody else spy on a union member, Your Honor. It is a little bit... To help a fellow unit. It's to help spy on... Yeah, help. The word help is in there. It's helping the employer spy on another union member. Yes, Your Honor, but that's a change. In other words, if we took that reporting issue and said somebody can report anything to another unit member, a lot of employees know about investigations. A lot of employees see other employees engaged in misconduct and could potentially tip them off. The Board has never found that simply being able to tip somebody off is enough to make somebody a guard under the Act. And that would... Well, I can see that because that would cast a very wide net because from time to time anyone might be in that position. This is their job. This is not their job in large part. Not only to spy on other employees, I mean, and patrons. It's a small part of their job. I mean, the surveillance techs who testified said this was a very rare occurrence. They could only think of there was the restaurant issue, but they could only think of about one or two instances where this kind of thing had ever happened where they could identify the employer groups of employees being targeted. There's a lot of security cameras in both of these hotels and casinos. And so the surveillance techs are asked to move a lot of security cameras. A lot of times, even if they're asked to do it for a special event, it's not an investigation or something along those lines. In fact, about monthly, both of these locations host large events that they need surveillance techs to move a lot of cameras for. And so the idea that this is a big part of their job, that this is the main thing that they do is setting up these cameras where they know who's on the receiving end of this is just not supported by the record. Well, let's talk about the main part then. That is enforcing rules, guarding the assets and the property of the company. Have you ever seen the movie Ocean's Eleven? Yes, Your Honor. Do you remember that? And I think it was Bellagio. And the surveillance cameras were put on a fake feed so that everybody thought the vault was safe. And, in fact, they were emptying the vault completely. And one of the bandits was an electronics expert. Now, are you saying that that technician who would have had the responsibility of making sure those feeds were accurate was not guarding the assets and property of the owner? Yes, Your Honor. In that situation, the potential for sabotage isn't enough to make this employee a guard. That's not in their regular duties, say, cutting a feed or something along those lines. I don't even know if that's technologically feasible the way it was presented in that movie. But these operators are asking. It seems pretty realistic. It did. But then, again, keep in mind that these technicians are not actually – would not even be on the premises during that kind of time. That would be an operator looking at the feed that the technicians had set up with cameras earlier in the day. So even if a technician could say during their normal shift somehow alter cameras so that eight hours later they were playing something innocuous and an operator for that entire time wouldn't notice, even assuming that happened, that doesn't rise to the level of the technician enforcing work rules as part of their job. Their job – that's just a sabotage-type situation. And a lot of employees can sabotage equipment. I mean, somebody who isn't a surveillance tech operator could go cut the feeds just as easily as a surveillance tech could. So the potential for sabotage isn't enough to make these employees guards in and of itself. I guess they're certainly part of a team that's enforcing the rules. Yes, Your Honor. You just want to distinguish within the team who's a guard and who's not, who's a support person. Yes, Your Honor. And the board has consistently done that with court approval, such as in the Wells Fargo Third Circuit case. The board has said that being part of an integrated unit that does enforce rules is not enough to make a particular employee a guard. For instance, alarm technicians who are responsible for repairing and maintaining alarm systems are not generally guards unless there is something else that makes them a guard. There is something else here. There is the use of the technicians and only the technicians to guard the property and I guess also the safety of the patrons and the employees when they are aiming those cameras and only they can aim those cameras. And as I said at the beginning, it seems to me the cameras are the last resort, the fail-safe, the system that works when human eyes don't work or when floor supervisors are somewhere else. Well, Your Honor, that effect, the setting up and repairing the cameras, that's pretty similar to the alarm technicians who set up and repair the alarms. Other employees might be the ones who respond when the alarm goes off and those employees might be guards, but the employee who sets up the alarm itself has never been considered to be a guard. Taking the security officer patrolling on a catwalk hypothetical, for instance, or that example, these alarm technicians are not replacing that security officer who 30 years ago was walking around with a flashlight in a walkie-talkie. They're replacing the people who were repairing the walkie-talkie. So in this situation, it's not really... Yeah, so the alarm technicians are not actually enforcing these rules. They're not actually present for that sort of situation. If the Court has no further questions on the alarm technicians issue, I guess I will focus briefly on the sufficiency of the petition. Just to say that here, the Board has, for more than 70 years now, consistently allowed petitioners to not check the Box 7 on the petition form. It's been there. It has not changed in relevant part the Board's form in that amount of time. There's no reason to believe that because certain other parts of provisions of the Board's regulations have been interpreted as mandatory, that that provision is also suddenly mandatory, especially given that the Board has consistently interpreted it as a provision that even if mandatory, doesn't carry with it the sanction of dismissing a petition. All right. Thank you. All right. Thank you, Your Honor. Does Mr. Turner have any time? All right. Why don't you take a couple minutes? I would like to address a couple of comments. First, none of the surveillance technicians in the Petition 4 unit testified in this case. The only individuals that testified were management officials about the duties. And the record does not bear out a comment that the actual investigation or use of cameras and locking up cameras is a rare occurrence. The witnesses testified that special investigations with hidden cameras happen once to twice a month and that they lock cameras to focus on dealers and other specific individuals several times a month, if not more often than that. So it's our belief that the record shows that the surveillance technicians' role in active surveillance secret covert operations is a significant portion of their job duties. And not only is it significant in terms of time spent, but it's most important or one of the most important duties that they have. The other thing I wanted to address... I do want to ask you one thing. They're not on duty 24 hours. Is that right? That's correct. They're not. Are they on call or is it in the record? They are on call. Is that in the record? Yes. Okay. We talked briefly about cases addressing conflicts of interest outside the strike context. There are a number of cases cited in pages 46 to 53 of our opening brief. Wright Memorial, for example, talks about ambulance drivers performing patrol. There's several other cases cited therein that talk about just the general enforcement of rules, not necessarily in the strike-related context. The other thing that I'd like to say about that is if these surveillance technicians... Well, first of all, dispatchers also just sit at a radio and call things in. They don't actively monitor video feeds. They don't actively observe misconduct. But there's never been any question that a security dispatcher is a security guard within the meaning of the act. The board has never taken a position that a dispatcher isn't covered by 9b-3. The second thing that I wanted to say is that... Wouldn't they be more analogous to the operator? Wouldn't a dispatcher be more analogous to the surveillance operator than the technician? Not really, because the dispatcher just sits at a radio, receives information from others, and radios guards on the floor to go to a particular place. They don't have any eyes. They don't actively observe what's going on on the casino floor. A dispatcher is just a go-between. And they're sort of connective tissue in the security operation, the same way that our surveillance technicians are. Two other things, if you would grant me time, would be, first, the technological Oceans 11-type scenario. That is in the record. A witness named Edwin Collier described in detail how that could be accomplished by these surveillance technicians to the point of being able to turn off particular cameras, being able to erase the fact that those cameras had been turned off. And it's our position that any conflict of interest, any sabotage situation is always hypothetical, but the point of the 9b-3 exclusion is to prevent an employer from being subject to that conflict of interest. The last comment I wanted to make is that one of the biggest things in board precedent is that partial strikes, partial unit strikes, aren't protected. And in this kind of situation that's been described, if the security department, for example, were to go on strike, these individuals wouldn't be covered by that strike. So we would have surveillance technicians, a partial strike of the department. Or, similarly, if engineers, a bargaining unit of engineers, were to go on strike, yet a group of individuals represented by the same union are responsible for maintaining the cameras,  from sabotage or misconduct associated with that strike. The potential for a conflict of interest is clear. Are any of the security people bonded? Yes. Who? The director of the department and security investigators. I can't speak to all of the guards. I know that those individuals are bonded because they carry firearms at Bellagio and Mirage. Okay. And how about the surveillance operators? Are they bonded? Not to my knowledge. And technicians, I assume, are not bonded. No. They are subject to higher background check requirements. All right. Thank you. Thank you.
judges: Henderson, Srinivasan, Ginsburg